UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

DIANA DANNENFELSER,

Plaintiff,

-against-

FLEXI NORTH AMERICA, LLC and PETCO ANIMAL SUPPLIES STORES, INC, d/b/a PETCO,

Defendants.

-----------------------------------------------------------X

**MEMORANDUM AND OPINION**
22-CV-6608(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this products liability action are two motions. The first is Defendants' Flexi North America, LLC ("Flexi N.A.") and Petco Animal Supplies Stores, Inc. ("Petco" and, together, "Defendants") motion *in limine* seeking to preclude the expert report and testimony of Plaintiff's engineering expert, Kristopher Seluga, M.S. ("Seluga") pursuant to Federal Rule of Evidence ("Fed. R. Evid.") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). *See* Docket Entry ("DE") [85]. The second is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). DE [86]. Plaintiff Diana Dannenfelser ("Plaintiff" or "Dannenfelser") opposes both motions. *See* DE [85], [86]. For the reasons set forth herein, the motion *in limine* is denied and the motion for summary judgment is granted in part and denied in part.

# I. BACKGROUND

## A. Factual Background

### 1. The Leash and Plaintiff's Injury

This action arises out of injuries Plaintiff sustained while using a Flexi New Classic medium retractable dog leash (the "Leash"). *See generally* Complaint. DE [1]. Non-party Flexi-Bogdahn International GmbH & Co. KG ("Flexi-Bogdahn") designs and manufactures Flexi retractable dog leashes, including the Leash at issue in this action. *See* Defendants' Response to Plaintiff's Counterstatement of Material Facts ("Defs.' 56.1 Resp."), DE [86], ¶¶ 3, 8. Defendant Flexi N.A. sells and distributes the Leash in the United States, including to Defendant Petco, from where Plaintiff purchased the Leash. *Id.* at ¶¶ 4-5, 8; Defendants' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), DE [86], ¶ 9; Declaration of Edward O'Toole ("O'Toole Decl."), DE ]86], Ex. F. Flexi N.A.'s Vice President of Operations, Bill House, testified that Flexi N.A. does not design, manufacture, inspect, test, or perform quality control on the leashes it receives and distributes. *See* Deposition Transcript of Bill House ("House Dep. Tr."), DE [86], at 21:13-21, 30:18-25, 35:23-36:5, 37:16-24. Likewise, Petco's Senior Director of Pet Care and Cleanup Categories, Cody Nelson, testified that Petco does not participate in the design or manufacture of the Leash and does not independently perform safety testing or risk assessments on Flexi products. *See* Deposition Transcript of Cody Nelson ("Nelson Dep. Tr."), DE [86], at 43:10-44:25.

The Leash is manufactured and sold in both a "cord" style and a "tape" style. *See* House Dep. Tr. at 40:19-22; Defs.' 56.1 Resp. ¶ 10. Both styles are retractable,

but the material connecting the leash's handle to the dog's collar differs. *See* Expert Report of Kristopher Seluga ("Seluga Report"), DE [85], at 2, 13. The cord style – which is at issue here – utilizes a thin, round cord approximately 0.09 inches in diameter, whereas the tape style utilizes a flat, wider band that is approximately 0.44 inches wide. *Id.* at 13. House testified that the tape version is stronger than the cord version for larger dogs, tends to tangle less, and is less likely to cause injury if it becomes wrapped around a user's finger or limb. *See* House Dep. Tr. at 40:19-42:24, 46:1-47:8. Flexi N.A. was aware that a cord leash can cause finger injury. *Id.* at 42:5-24, 57:23-58:1; O'Toole Decl. Ex. E, Special Precautions and Directions Pamphlet ("Warnings Pamphlet"), at 139.

On February 23, 2021, Dannenfelser purchased the Leash to use with her dog, Brody. *See* Deposition Transcript of Diana Dannenfelser ("Dannenfelser Dep. Tr."), DE [86], at 27:4-17. The parties dispute Brody's relevant weight at the time of the accident, with Plaintiff estimating that Brody weighed approximately forty-five pounds, and Defendants, relying on Seluga's report, estimating that Brody weighed approximately seventy pounds. *See* Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Pl.'s Opp'n"), DE [86], at 2-3; Defendants' Memorandum of Law in Support of Summary Judgment ("Defs.' Mem."), DE [86], at 2, 6, 10; Dannenfelser Dep. Tr. at 24:25 - 25:9; Seluga Report at 15; Defs.' Rule 56.1 Stmt. ¶¶ 11-13. Dannenfelser questions the accuracy of the veterinary weights, claiming that Brody's precise weight was not a significant contributing factor because Seluga's cord-leash testing produced skin penetration at the Leash's forty-four-pound rating. *See*

Pl.'s Opp'n at 2-3, 6-7. On April 7, 2022, while Plaintiff was using the Leash to walk Brody, Brody lunged forward and across Plaintiff's body, causing the tips of two of her fingers to be severed. *See* Dannenfelser Dep. Tr. at 20:2-21:18. Dannenfelser denied that any part of her body had been touching the cord before Brody was startled. *Id.* at 22:21-23:6.

2. <u>Leash Warnings and Packaging</u>

The Leash was sold with warnings about the hazards associated with its retractable cord. Specifically, the Leash included a "Special Precautions and Directions" pamphlet warning that a cord running across a person's skin could cause severe cuts and that, if the cord becomes wrapped around a user's fingers or catches on a ring, a sufficiently forceful pull could result in amputation or broken bones. *See* Warnings Pamphlet at 139. The Warnings Pamphlet therefore instructs users not to touch the cord. *Id.* It further explains that Flexi uses a tape or belt, rather than a cord, in certain leashes for larger dogs "to reduce the risk of amputations and cuts," while cautioning that even a small dog can exert sufficient force to cause injury because the length of a retractable leash permits the dog to build speed. *Id.* at 138-39. The Leash's handle separately bears an "Amputation/Cutting/Burning Hazard" warning instructing the user to never touch the leash or permit it to wrap around any part of the body. *See* Seluga Report at 20-21. The handle also identifies the Leash as having a maximum dog-weight rating of forty-four pounds. *Id.* at 21.

With respect to the Leash's packaging, Dannenfelser testified that she did not realize that she had selected the cord-style version of the Leash. *See* Dannenfelser

Dep. Tr. at 93:1-25. According to Plaintiff, while the Leash remained in its packaging, the portion of the lead that was visible to her was the wider material located immediately adjacent to the clasp, rather than the thin retractable cord itself. *Id.* at 93:1-25. Dannenfelser understood that the Leash was to be held by its handle, that she should not grab the cord, and that she should not permit the cord to become wrapped around her fingers. *Id.* at 36:23-39:23, 47:22-48:11. A user manual provided with the Leash similarly explained that a tape or belt is used in place of a cord on leashes for larger dogs to reduce the risk of amputations and cuts. *See* Warnings Pamphlet at 138-39.

3. Seluga's Expert Report

Seluga is a licensed professional engineer with bachelor's and master's degrees in mechanical engineering from the Massachusetts Institute of Technology. *See* Seluga Report at 43. He inspected the Leash, as well as exemplar cord- and tape-style leashes, measured the subject cord at approximately 0.09 inches in diameter and the exemplar tape at approximately 0.44 inches wide, and found that the Leash at issue was functional as designed. *Id.* at 13. As part of his analysis, Seluga constructed a drop-weight apparatus using metal rods wrapped in pig skin to model adjacent fingers. *Id.* at 14. A drop-weight apparatus uses a known suspended mass that is allowed to fall through a measured distance, thereby imposing a sudden dynamic load on the test specimen. Here, Seluga attached forty-four and seventy-pound weights to exemplar leashes and dropped them approximately two to four feet so that he could compare, under controlled loading conditions intended to

approximate a dog's sudden pull, whether the cord and tape materials penetrated the pig-skin surrogate. *See* Seluga Report at 14-15. In Seluga's tests, with the exemplar in the locked position, the cord penetrated the pig skin at forty-four pounds, while the tape did not penetrate it at seventy pounds. *Id.* at 15-16. The forty-four-pound weight corresponded to the Leash's maximum rated dog weight, while the seventy pound weight reflected Seluga's estimate of Brody's weight based on the available weight and age information. *Id.* at 14-15. Seluga reported that unlocked leashes did not cut through the skin, even with the 70-pound weight. *Id.* at 15.

Ultimately, Seluga opined, to a reasonable degree of engineering certainty, that the Leash was defectively designed and unreasonably hazardous because its thin cord created a serious laceration and amputation risk. *Id.* at 23. He concluded that technically and economically feasible alternatives – including a tape-style retractable leash or a traditional non-retractable leash – would have significantly reduced or eliminated that risk and, more likely than not, prevented Plaintiff's injuries. *See generally* Seluga Expert Report. Because safer designs were feasible, he considered warnings alone insufficient to address the cord's injury risk. *Id.* at 16, 20. Moreover, because the cord penetrated the simulated skin at the Leash's rated forty-four pound limit, while the tape did not do so at seventy pounds, he concluded that Brody's precise weight was not a significant contributing factor in Dannenfelser's injury. *Id.* at 15-16, 21-23; *see* Deposition Transcript of Kristopher Seluga ("Seluga Dep. Tr."), DE [85], at 21:15-24:11.

### B. Procedural Background

By way of a Complaint dated October 31, 2022, Plaintiff commenced this action against Flexi Bodigahn, Flexi N.A., and Petco. DE [1]. On May 25, 2023, Dannenfelser filed an Amended Complaint, *see* DE [29], and, on December 3, 2024, she filed a Second Amended Complaint ("SAC"), which is the operative pleading in this action. DE [69]. In the SAC, Plaintiff asserts causes of action for design defect, negligent design, failure to warn, and breach of express and implied warranties. *See* SAC ¶¶ 30-81. Plaintiff's claims against Flexi-Bogdahn were subsequently dismissed without prejudice, leaving Flexi N.A. and Petco as Defendants. *See* DE [72]. The instant fully briefed motions were filed on December 29, 2025.[1] *See* DE [85], [86].

## II. LEGAL STANDARDS

### A. Motion *In Limine*

Federal Rule of Evidence 702 permits expert testimony where the proponent demonstrates that it is more likely than not that the expert's specialized knowledge will assist the trier of fact, the testimony rests on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert reliably applied those principles and methods. *See* Fed. R. Evid. 702; *Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 2778-79 (1987) (holding that preliminary questions concerning admissibility are determined by the court under a

[1] Plaintiff did not submit the paragraph-by-paragraph response required by Local Civil Rule 56.1(b), instead filing only a separate Counterstatement. DE [86]. Although properly supported assertions may be deemed admitted, the Court retains discretion to review the record and may not deem admitted an assertion unsupported by the cited evidence. *See Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (holding that an unopposed Rule 56.1 assertion must still be supported by the record); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (explaining that a district court has broad discretion in applying its local summary-judgment rules but may not rely on unsupported assertions).

preponderance-of-the-evidence standard). The district court must ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2798 (1993) (requiring trial courts ensure that expert testimony is relevant and reliable); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 1174-75 (1999) (extending the court's gatekeeping obligation to all expert testimony governed by Rule 702); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (holding that the district court must determine whether expert testimony rests on a reliable foundation and is relevant).

Reliability considerations include testability, peer review, error rate, governing standards, and general acceptance. *See Daubert*, 509 U.S. at 593-94, 113 S. Ct. at 2796-97; *United States v. Requena*, 980 F.3d 30, 46-47 (2d Cir. 2020) (applying *Daubert*'s flexible reliability inquiry); *Restivo v. Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (observing that the reliability inquiry related to expert testimony is flexible and depends on the particular circumstances of the testimony). Expert testimony may be excluded based upon a methodological flaw. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) (recognizing that exclusion is appropriate where there is too great an analytical gap between the data and the expert's opinion); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (directing exclusion where flaws in an expert's methodology are sufficiently critical to render the opinion unreliable). Weaknesses that are not critical, however, may simply bear on the weight of the expert's opinion. *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2796-97 (explaining that vigorous cross-examination and contrary evidence

are the traditional means of attacking admissible but contestable expert testimony); *Restivo*, 846 F.3d at 577 (concluding that alleged shortcomings that did not undermine the expert's basic methodology were properly left for cross-examination); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (holding that disputes concerning an expert's assumptions and factual basis generally affect weight rather than admissibility).

**B. Summary Judgment**

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986) (holding that summary judgment is appropriate only where no genuine dispute of material fact exists); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986) (explaining the movant's burden where the nonmovant bears the burden of proof at trial). The Court views the evidence in the light most favorable to the nonmovant, draws all reasonable inferences in that party's favor, and does not weigh evidence or decide credibility. *Anderson,* 477 U.S. at 255, 106 S. Ct. at 2513 (requiring courts to draw justifiable inferences in favor of the nonmovant and refrain from credibility determinations); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000) (reiterating that courts may not weigh evidence or make credibility determinations at summary judgment); *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005)

(recognizing the narrow circumstances in which testimony may be so contradictory and incomplete that no reasonable jury could credit it).

## III. DISCUSSION

### A. Motion *In Limine* to Preclude Seluga

In moving to preclude Seluga's expert opinion, Defendants attack his "drop-weight testing." As described above, in these tests Seluga wrapped an exemplar cord- or tape-style leash around two quarter-inch-diameter brass rods covered with pig skin to simulate fingers, attached a forty-four or seventy pound weight, and allowed the weight to fall approximately two to four feet. This was intended to imitate a dog unexpectedly pulling on the leash. *See* Seluga Report at 14-16. Defendants challenge the reliability of Seluga's conclusion on the grounds that the apparatus used was developed for this litigation without independent validation or peer review, used brass rather than an accepted bone surrogate, did not measure the force applied in every test, and produced failed or irregular runs involving varying drop heights, knots, and reused or damaged leashes. *See* Defendants' Reply in Support of the Motion to Preclude Seluga ("Def. Preclusion Reply"), DE [85], at 3-5, 7-9. While Defendants do not claim that an exact recreation of the injury was required, they assert that the testing was not valid as a reliable means of evaluating amputation risk. *Id.* at 4-5, 9.

Defendants' arguments, while reasonable, do not require exclusion of Seluga's opinion. *See Amorgianos*, 303 F.3d at 267 (explaining that minor flaws do not render an otherwise reliable opinion inadmissible, while requiring reliability at every step

of the analysis). Defendants support their objections with the report and deposition testimony of their expert, Dr. Lisa Lallo. *See* Def. Preclusion Reply at 6-9 (citing O'Toole Decl. Exs. A, B). Dr. Lallo challenges Seluga's use of injury surveillance data, the absence of validation and peer review of his custom apparatus, and the suitability of brass as a bone substitute. *Id.* at 6-8. Dr. Lallo explains that validation could include comparison with cadaver testing, measurements of forces exerted by a dog on the leash, or computational modeling, and criticizes the absence of defined positive and negative controls and calibrated measurements confirming the applied loads. *Id.* at 7 (quoting Dr. Lallo Report. DE [85]. at 12 and Deposition Transcript of Dr. Lallo at 52:9-20). She further distinguishes similarity in yield strength—the point at which a material permanently deforms—from similarity in breaking behavior, and identifies cadavers and sawbones as accepted alternatives to brass. *Id.* at 8-9 (quoting and discussing Lallo Rep. at 17-18).

These arguments are better presented to assess the weight of Seluga's testimony rather than its admissibility. Seluga's experiments compared the cord and tape designs rather than attempting to duplicate the accident in every respect. *See* Seluga Dep. Tr. at 77:24-80:7, 105:1-8. His report describes the exemplary skin, falling weights, drop distances, wrapping conditions, and completed-test results. *See* Seluga Report at 14-16. Seluga observed that the cord penetrated the skin at forty-four pounds, while the tape did not penetrate it at seventy pounds. *Id.* at 15-16. Moreover, the Seluga Report identifies rods as a surrogate for bone as they have similar strength properties, and not merely as an arbitrary support. *Id.* at 14.

At his deposition, however, Seluga conceded that his testing did not address every aspect and that, for example, he concluded that determining the point at which a finger bone would break was beyond the scope of his testing. *See* Seluga Dep. Tr. at 63:17-64:6, 65:16-23. To this end, he acknowledged that the rods did not break in any test and that he had not measured the force applied across all tests. *Id.* at 105:17-22. Further, the Seluga Report explains that the simulated fingers were rigidly fixed, unlike Plaintiff's movable hand, arm, and body, and Seluga reasoned that this arrangement would produce peak forces as great as those experienced in the accident. *See* Seluga Rep. at 15. He further explained that rigid fixation made the comparison repeatable and, in his view, conservative when evaluating whether the tape would penetrate skin. *See* Seluga Dep. Tr. at 78:9-79:20. His relevant inference was that skin penetration is a necessary step toward amputation, so the tape's failure to penetrate the skin under the tested conditions supported his opinion. *See* Seluga Report at 15-16; Seluga Dep. Tr. at 63:10-21, 64:12-20, 106:3-11. The totality of this testimony on these topics is sufficiently relevant and reliable to submit at trial. Accordingly, Defendant's motion *in limine* is denied.

**B. <u>Summary Judgment</u>**

The Court turns to the merits of Defendant's summary judgment motion.

1. <u>Design Defect and Negligent Design</u>

Under New York law, a design-defect plaintiff must show that the product posed a substantial likelihood of harm, that it was feasible to design the product more safely, and that the defective design was a substantial factor in causing the injury.

*See Yun Tung Chow v. Reckitt & Colman, Inc.*, 17 N.Y.3d 29, 33-34, 926 N.Y.S.2d 377, 378 (2011) (observing that design-defect liability turns on whether a reasonable person would conclude that the product's utility did not outweigh its inherent risk); *Adams v. Genie Indus., Inc.*, 14 N.Y.3d 535, 542, 903 N.Y.S.2d 318 (2010) (recognizing that proof that the product was not reasonably safe and that a feasible safer design was required); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107-09, 463 N.Y.S.2d 398 (1983) (establishing New York's risk-utility standard for strict-liability design-defect claims). The inquiry balances risk against utility. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 259 (1995) (explaining that strict-liability design defect is governed by a risk-utility inquiry focused on whether the product was reasonably safe); *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d at 400 (identifying factors relevant to balancing a product's risks against its utility). In technical cases, expert proof is ordinarily required to establish the feasibility and efficacy of an alternative design. *See Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d, 719, 740 (E.D.N.Y. 2016) (granting summary judgment where the plaintiff's expert failed to test or otherwise substantiate the proposed alternative design); *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692-93 (S.D.N.Y. 2003) (explaining that expert evidence is generally necessary where the feasibility and safety of an alternative design involves technical matters beyond ordinary knowledge). Relevant here, a distributor that did not design a defective product may be held liable for design defect. *See Godoy v. Abamaster of Miami, Inc.*, 302 A.D.2d 57, 60-61, 754 N.Y.S.2d 301, 305-06 (2d Dep't 2003) (holding that a "manufacturer, wholesaler, distributor, or retailer" selling a defective product

is subject to strict products liability and explaining that the defect can consist of "either a manufacturing flaw, improper design, or a failure to provide adequate warnings"); *Gensler v. Sanofi-Aventis*, No. 08-CV-2255(DGT)(RER), 2009 WL 857991, at *7-8 (E.D.N.Y. Mar. 30, 2009) (observing the possibility that a distributor "may be liable without any fault on its part under general product liability principles"); *Bickram v. Case I.H.*, 712 F. Supp. 18, 22 (E.D.N.Y. 1989) (observing that New York law imposes strict liability for defective products upon manufacturers and entities involved in placing a product in the stream of commerce) (internal quotation omitted).

Plaintiff has adduced sufficient evidence to reach a jury. Seluga opines that the thin cord concentrates force over a substantially smaller contact area than Flexi's wider tape design. *See* Seluga Report at 13. His completed locked tests showed cord penetration of the skin surrogate at forty-four pounds and no tape penetration at seventy pounds. *Id.* at 15-16. This comparative evidence is reinforced by Flexi's own product information, which states that a tape or belt is used instead of a cord to reduce the risk of amputations and cuts, and by House's testimony that a tape is stronger, tangles less, and is less likely than a cord to cause injury when wrapped around a body part. *See* House Dep. Tr. at 40:19-47:8; Warnings Pamphlet at 139. Moreover, the tape version is not a hypothetical prototype, as Flexi already manufactures and sells it in the same product line, and House identified no material functional advantage of a cord beyond customer preference. *See* House Dep. Tr. at 41:1-44:25. A jury could therefore conclude that the tape-style is a feasible alternative that retains the utility of a retractable leash while reducing the relevant

hazard. *See Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 244, 252 (E.D.N.Y. 2014) (explaining that a feasible alternative design may be supported by testing and must be economically and technically feasible); *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 178 (E.D.N.Y. 2008) (explaining that separate testing is unnecessary where the expert identifies an existing marketplace design incorporating the proposed alternative).

Further, Dannenfelser has produced sufficient evidence of causation and proper use to defeat Defendant's contrary argument. Plaintiff denies grabbing the cord and testified that she was holding the handle in her right hand when Brody was startled and crossed in front of her. The injured fingers were on her left hand. *See* Dannenfelser Dep. Tr. at 20:2-23:6. The record also contains evidence that Flexi understood a cord could contact or wrap around a user as a result of a dog's movement and that even a small dog can build sufficient speed on an extended retractable leash to cause injury. *See* House Dep. Tr. at 42:5-24, 57:23-58:1; Warnings Pamphlet at 139. Defendants point to Brody's possible weight above the leash's forty-four-pound rating, but Seluga's cord testing produced skin penetration at forty-four pounds, the stated maximum weight, while the tape did not penetrate the skin surrogate even at seventy pounds. *See* Seluga Report at 15-16. On this record, a trial is required. *See Yun Tung Chow*, 17 N.Y.3d at 34, 926 N.Y.S.2d at 378 (reversing summary judgment where the record permitted competing inferences concerning design defect); *Voss*, 59 N.Y.2d at 110-11, 463 N.Y.S.2d at 400 (recognizing that questions concerning whether a product was reasonably safe and whether its design caused the injury are

ordinarily for the factfinder where competing evidence exists). Accordingly, Defendants' motion for summary with respect to Plaintiff's design defect and negligent design is denied.

2. Failure to Warn

A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, including reasonably foreseeable misuse. *See Fane v. Zimmer, Inc.*, 927 F.2d 124, 129 (2d Cir. 1991) (identifying the elements of a New York failure-to-warn claim); *Greenwood v. Arthrex, Inc.*, No. 21-CV-1101S(WMS), 2023 WL 3570436, at *4 (W.D.N.Y. May 19, 2023) (explaining that the duty to warn arises when a manufacturer knows or should know of a danger arising from a foreseeable use of the product); *Khusenov v. Prokraft Inc.*, No. 21-CV-3703(EK)(RER), 2023 WL 1785527, at *11-12 (E.D.N.Y. Feb. 6, 2023) (recognizing that a manufacturer must warn against foreseeable misuse but need not warn of every possible or obvious risk); *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.3d 764, 765 (1998) (holding that a manufacturer must warn of latent dangers arising from foreseeable uses and reasonably foreseeable misuse). Again, relevant here, "the failure to provide warnings gives rise to liability not only against the manufacturer, but against the distributor and retailer as well." *LaScala v. QVC*, 201 A.D.2d 783. 800-01. 162 N.Y.S.3d 383, 400 ("The failure to provide warnings gives rise to liability not only against the manufacturer, but against the distributor and retailer as well.") (2d Dept. 2022( *(*quoting *Reece v. J.D. Posillico, Inc.*,, 164 A.D.3d 1285, 1287, 83 N.Y.S. 672, 676 (2d Dep't 2018)),. Ordinarily, the adequacy of a

warning and whether an inadequate warning was a substantial factor in causing injury are questions of fact. *Liriano*, 92 N.Y.2d at 241-42, 677 N.Y.S.3d at 765 (explaining that warning adequacy and causation frequently present fact questions for the jury); *Johnson v. Johnson Chem. Co.*, 183 A.D.2d 64, 69, 588 N.Y.S.2d 607, 610-11 (2d Dep't 1992) (holding that the adequacy of a warning generally presents a question of fact).

Defendants emphasize that the supplied warnings related to the Leash expressly disclosed finger amputation and that Plaintiff understood she should not touch or wrap the cord around her fingers. *See* Defs' Mem. at 2, 10-11; Warnings Pamphlet at 139; Dannenfelser Dep. Tr. at 37:7-16, 39:9-23, 47:10-48:11. The record, however, permits a distinction between deliberately grabbing the cord and the cord unexpectedly contacting a user during ordinary operation. Plaintiff testified that she complied with the former instruction and held the handle in her right hand and did not touch the cord before Brody was startled, yet the cord nevertheless became wrapped around fingers on her left hand. *See* Dannenfelser Dep. Tr. at 20:2-23:6, 62:1-25. Likewise, Seluga noted that, accepting Plaintiff's testimony, her conduct was consistent with the handle warning immediately before the accident. *See* Seluga Report at 20-21. Further, the Warnings Pamphlet recognizes both that a cord wrapped around fingers can amputate them and that even small dogs can generate injurious force because a retractable leash allows them to build speed. *See* Warnings Pamphlet at 139. In these circumstances, the adequacy of the warning in communicating the risk of sudden, inadvertent entanglement – and the causal effect

of any deficiency – present factual questions appropriate for trial. *See Liriano*, 92 N.Y.2d at 241-42, 677 N.Y,S.2d at 303 (recognizing that warning adequacy and proximate cause are ordinarily jury questions where reasonable minds may differ); *see also Fane*, 927 F.2d at 129 (requiring proof that the failure to warn was a substantial factor in causing the injury). Accordingly, Defendants' motion for summary judgment is denied with respect to the failure to warn claim.

3. Breach of Warranty

New York recognizes two types of breach of warranty: (1) breach of express warranty, and (2) breach of implied warranty. A claim for breach of express warranty requires an affirmation of fact or promise concerning the goods that becomes part of the basis of the bargain. *See Rogath v. Siebenmann*, 129 F.3d 261, 264 (2d Cir. 1997) (requiring the plaintiff to identify an actionable promise or representation that formed part of the bargain to prevail on a breach of warranty claim); *CBS Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 502-03, 554 N.Y.S.2d 449 (1990) (holding that an express warranty arises from an affirmation of fact that becomes part of the basis of the bargain). Although the SAC alleges generally that Defendants warranted that the leash was safe and fit for its intended use, *see* SAC ¶¶ 45-50, Dannenfelser does not identify a specific affirmation of fact or promise that became part of her bargain and was later breached. Nor does the record identify any representation on which Plaintiff relied in selecting this particular cord-style leash. *See M.H. v. Bed Bath & Beyond Inc.*, 156 A.D.3d 33, 38, 64 N.Y.S.3d 205, 206. (1st Dep't 2017) (holding that summary judgment was appropriate on an express-warranty claim where the

defendant established lack of reliance and the plaintiffs did not address the claim in opposition). Reliance in this context means reliance on the warranty as part of the bargain, not necessarily belief in the truth of the warranted information. *See CBS Inc.*, 75 N.Y.2d at 503-04, 554 N.Y.S.2d at 503 (distinguishing contractual reliance on an express warranty from tort-based reliance on a representation's truth).

Here, Plaintiff testified that she did not realize at the time of purchase that she had selected the cord version because the packaging exposed the wider material adjacent to the clasp rather than the cord itself. *See* Dannenfelser Dep. Tr. at 93:1-25. Further, she argues that Flexi N.A. possessed superior knowledge concerning the Leash's dangers and that she relied on Flexi N.A.'s special knowledge in marketing and placing the product into the stream of commerce as safe, emphasizing her testimony that she did not appreciate the risk of entanglement or amputation when the Leash was used as intended. *See* Pl.'s Opp'n at 22-24. This argument, however, does not identify a definite affirmation of fact or promise made by either remaining Defendant that became part of the basis of the bargain, as required for an express-warranty claim. *See Rogath*, 129 F.3d at 264 ("[W]hat the buyer knew and, most importantly, whether he got that knowledge from the seller are the critical questions."); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014) (explaining that an express-warranty claim requires a specific affirmation of fact or promise rather than generalized product representations). Accordingly, a reasonable jury could not find for Plaintiff on her express-warranty claim.

The implied warranty of merchantability requires that goods be fit for the ordinary purposes for which such goods are used. *Denny*, 87 N.Y.2d at 258-59, 639 N.Y.S. at 259 (explaining that merchantability focuses on whether a product is fit for its ordinary purpose, a concept distinct from strict-liability risk-utility analysis); *Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 66, 783 N.Y.S.2d 698, 700-02 (3d Dep't 2004) (requiring proof that the product was not fit for its ordinary purpose in a claim for breach of implied warranty). This standard asks whether the product was minimally fit for its ordinary purpose, not whether a safer design could have been adopted. *See Denny*, 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 259; *Nemes v. Dick's Sporting Goods, Inc.*, 521 F. Supp. 3d 328, 341-42 (S.D.N.Y. 2021) (granting summary judgment where the evidence did not show that the product failed to satisfy the minimum level of quality required for its ordinary purpose).

The undisputed evidence relevant to this distinct theory establishes that Seluga inspected the subject leash and found that it remained functional and operated as designed. *See* Seluga Report 13. Plaintiff likewise used the Leash to walk Brody for more than a year before her accident. *See* Dannenfelser Dep. Tr. at 27:4-17; Defs'. 56.1 Stmt. ¶ 9. The product also carried a two-year limited warranty against defects in materials and workmanship, and Plaintiff identifies no evidence that the Leash departed from those specifications or suffered a mechanical malfunction. *See* Warnings Pamphlet at 138. Thus, even though Plaintiff has raised triable issues concerning whether the cord design was reasonably safe under New York's risk-utility analysis, the record does not support the distinct conclusion that

the Leash was unfit for the ordinary purpose of restraining and walking a dog. *See Denny*, 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 259 (distinguishing the consumer-expectations inquiry governing merchantability from strict-liability design defect). Accordingly, Dannenfelser's breach-of-warranty-of-merchantability claim fails as a matter of law.

To the extent Plaintiff separately invokes an implied warranty of fitness for a particular purpose, that theory also fails because the asserted purpose – walking a dog – does not reflect any distinct or specialized use for the Leash for which Plaintiff relied on Defendants' skill or judgment. *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 557 (S.D.N.Y. 2016) (explaining that a particular-purpose warranty requires a purpose peculiar to the buyer that differs from the product's ordinary use); *APS Tech., Inc. v. Brant Oilfield Mgmt. & Sales, Inc.*, No. 13-CV-6500(LTS)(KNF), 2015 WL 5707161, at *7 (S.D.N.Y. Sept. 29, 2015) (holding that an implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability where the asserted particular purpose coincides with the product's general function or use). Accordingly, summary judgment is granted with respect to Plaintiff's claims for breach of express and implied warranty.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion *in limine* seeking preclusion of the expert report and testimony of Kristopher Seluga is denied. Defendants' motion for summary judgment is granted with respect to Plaintiff's express- and implied-warranty claims and otherwise denied. Plaintiff's negligent-design, strict-liability for

design-defect, and failure-to-warn claims shall proceed at trial. A status conference has been scheduled for October 15, 2026 at 11:00 a.m. in Courtroom 820 of the Central Islip courthouse.

**SO ORDERED**

Dated: Central Islip, New York
September 29, 2026

*/s/ Steven I. Locke*
STEVEN I. LOCKE
United States Magistrate Judge